The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

SUSAN DOOLITTLE

**DEFENDANTS**

FIDELITY NATIONAL FINANCIAL, INC.; FIDELITY NATIONAL TITLE INSURANCE COMPANY; (See Attachment A)

**(b)** County of Residence of First Listed Plaintiff  San Francisco County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Gross Belsky Alonso LLP
180 Montgomery Street, Suite 2200
San Francisco, CA 94104
T: 415-544-0200

Attorneys (If Known)

08 - 3579 EDL

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2 | U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | or Defendant) | ☐ 900Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | ☐ 871 IRS—Third Party | Determination |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | 26 USC 7609 | Under Equal Access |
| | ☐ 446 Amer. w/Disabilities – | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | to Justice |
| | Other | | Alien Detainee | | ☐ 950 Constitutionality of |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | State Statutes |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §§ 1, 15, 26

Brief description of cause:
Defendants, together with their co-conspirators, participated in a conspiracy to fix the price of title insurance in California.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2) (PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND        ☐ SAN JOSE

DATE
July 25, 2008

SIGNATURE OF ATTORNEY OF RECORD

## **ATTACHMENT A**

TICOR TITLE INSURANCE COMPANY; TICOR TITLE INSURANCE COMPANY OF
FLORIDA; CHICAGO TITLE INSURANCE COMPANY; NATIONAL TITLE INSURANCE
OF NEW YORK, INC.; SECURITY UNION TITLE INSURANCE COMPANY; THE FIRST
AMERICAN CORPORATION; FIRST AMERICAN TITLE INSURANCE COMPANY;
UNITED GENERAL TITLE INSURANCE COMPANY; LANDAMERICA FINANCIAL
GROUP, INC.; COMMONWEALTH LAND TITLE INSURANCE COMPANY; LAWYERS
TITLE INSURANCE CORPORATION; TRANSNATION TITLE INSURANCE COMPANY;
STEWART TITLE GUARANTY COMPANY; and STEWART TITLE INSURANCE
COMPANY.



1  Terry Gross (103878)
   Adam C. Belsky (147800)
2  Monique Alonso (127078)
   GROSS BELSKY ALONSO LLP
3  180 Montgomery Street, Suite 2200
   San Francisco, California 94104
4  Telephone: (415) 544-0200
   Facsimile:  (415) 544-0201
5
   Attorneys for Plaintiff SUSAN DOOLITTLE
6  and the Proposed Class

7

8                  **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10                     **SAN FRANCISCO DIVISION**

11  SUSAN DOOLITTLE,                        ) Case No.
                                            )
12              Plaintiff,                   ) **CLASS ACTION COMPLAINT and**
                                            ) **DEMAND FOR JURY TRIAL**
13                                           )
          v.                                 )
14                                           )
   FIDELITY NATIONAL FINANCIAL,             )
15 INC.; FIDELITY NATIONAL TITLE            )
   INSURANCE COMPANY; TICOR TITLE           )
16 INSURANCE COMPANY; TICOR TITLE           )
   INSURANCE COMPANY OF FLORIDA;            )
17 CHICAGO TITLE INSURANCE                  )
   COMPANY; NATIONAL TITLE                  )
18 INSURANCE OF NEW YORK, INC.;             )
   SECURITY UNION TITLE INSURANCE           )
19 COMPANY; THE FIRST AMERICAN              )
   CORPORATION; FIRST AMERICAN              )
20 TITLE INSURANCE COMPANY;                 )
   UNITED GENERAL TITLE INSURANCE           )
21 COMPANY; LANDAMERICA                     )
   FINANCIAL GROUP, INC.;                   )
22 COMMONWEALTH LAND TITLE                  )
   INSURANCE COMPANY; LAWYERS               )
23 TITLE INSURANCE CORPORATION;             )
   TRANSNATION TITLE INSURANCE              )
24 COMPANY; STEWART TITLE                   )
   GUARANTY COMPANY; and                    )
25 STEWART TITLE INSURANCE                  )
   COMPANY,                                 )
26                                           )
                Defendants.                  )
27  _____ )

28

                                    1

1   Plaintiff Susan Doolittle, individually and on behalf of the Class described below, brings this

2   action for treble damages and injunctive relief under the antitrust laws of the United States and the

3   unfair competition laws of the State of California against the above-named defendants and alleges as

4   follows:

5   **INTRODUCTION**

6   1.      Defendants, together with their co-conspirators, participated in a conspiracy to fix the

7   price of title insurance in California through an illegal scheme of collusive behaviour, market

8   allocation, and kickbacks and other illicit inducements to real estate agents, lenders, and other

9   middlemen who funnel business to defendants.  Because of Defendants' unlawful conduct and

10  conspiracy, plaintiff and others paid artificially inflated prices for title insurance.  Plaintiff brings this

11  class action on behalf of herself and all other persons and entities who purchased title insurance from

12  defendants or their subsidiaries, agents, or co-conspirators, during the four-year period preceding the

13  filing of this action.

14  **JURISDICTION AND VENUE**

15  2.      This Court has original jurisdiction over this action under the provisions of 28 U.S.C.

16  § 1331 (federal question) and 28 U.S.C. § 1337 (original jurisdiction over any claims arising under any

17  Act of Congress regulating commerce or protecting trade and commerce against restraints and

18  monopolies), because the Complaint alleges violations of the Sherman Act, 15 U.S.C. § 1, and

19  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  The Court has supplemental

20  jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367, because those claims are so

21  related to plaintiff's federal law claim that they form part of the same case or controversy.

22  3.      Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C.

23  § 1391(b) and (c), because defendants reside, have an agent, transact business, maintain an office, or

24  are otherwise found in this District.  Moreover, many of defendants' unlawful acts giving rise to

25  plaintiff's claim occurred, and a substantial portion of the affected interstate trade and commerce

26  described below has been carried out, in this District.

27  //

28  //

1

**INTRADISTRICT ASSIGNMENT**

2    4.    Intradistrict assignment is proper in this Division because a substantial part of the

3    property that is the subject of this action is situated in, and a substantial part of the events or omissions

4    which give rise to the claim occurred in, the Counties of San Francisco and San Mateo.

5

**THE PARTIES**

6    5.    Plaintiff, and proposed class representative, Susan Doolittle is an individual residing

7    in San Francisco, California.  Within the last four years, plaintiff purchased title insurance directly

8    from one or more of the defendants.  As a result of defendants' unlawful conduct alleged herein,

9    plaintiff has suffered injury in fact and paid artificially inflated prices for title insurance.

10    6.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

11    corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity National

12    does business in California through one or more of its subsidiaries, including but not limited to,

13    defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title

14    Insurance Company of Florida,  National Title Insurance of New York, Inc., Security Union Title

15    Insurance Company, and Chicago Title Insurance Company.  Fidelity National is registered to do

16    business in California.

17    7.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

18    corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

19    FNTIC does business in California, is a licensed title insurance company in California and is registered

20    to do business in California.

21    8.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation with

22    its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor does business

23    in California, is a licensed title insurance company in California and is registered to do business in

24    California.

25    9.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida corporation

26    with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  TTICF does

27    business in California, is a licensed title insurance company in California and is registered to do

28    business in California.

3

1    10.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri

2  Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

3  Chicago Title does business in California, is a licensed title insurance company in California and is

4  registered to do business in California.

5    11.    Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York

6  corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

7  NTINY does business in California, is a licensed title insurance company in California and is

8  registered to do business in California.

9    12.    Defendant Security Union Title Insurance Company ("SUTIC") is a California

10  corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.

11  SUTIC does business in California, is a licensed title insurance company in California and is registered

12  to do business in California.

13    13.    The Fidelity family of title insurance companies – which includes defendants Fidelity

14  National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC, and their affiliates – (collectively,

15  "Fidelity") is engaged in selling title insurance to purchasers of commercial and residential real estate

16  throughout the United States, including California. Nationally, Fidelity accounts for approximately

17  27 percent of title premiums, which in 2006 amounted to approximately \$4.6 billion.

18    14.    The Fidelity family of title insurance companies and their affiliates are wholly-owned

19  and controlled by defendant Fidelity National. Through its subsidiaries, Fidelity National is a provider

20  of title insurance, specialty insurance, and claims management services. In 2006, Fidelity National had

21  revenues of approximately \$9.4 billion. The Fidelity family of title insurance companies engaged in

22  the conduct challenged herein with the approval and assent of defendant Fidelity National.

23    15.    Defendant The First American Corporation ("First American") is a California

24  corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First American

25  does business in California through one or more of its subsidiaries, including but not limited to,

26  defendants First American Title Insurance Company and United General Title Insurance Company.

27    16.    Defendant First American Title Insurance Company ("FATIC") is a California

28  corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does

4

1    business in California, is a licensed title insurance company in California and is registered to do

2    business in California.

3        17.    Defendant United General Title Insurance Company ("UGTIC") is a Colorado

4    corporation located at 8310 S. Valley Highway, Suite 130, Englewood, Colorado 80112. UGTIC does

5    business in California, is a licensed title insurance company in California and is registered to do

6    business in California.

7        18.    The First American family of title insurance companies – which includes defendants

8    First American, FATIC and UGTIC, and their affiliates – (collectively, "First American") is engaged

9    in selling title insurance to purchasers of commercial and residential real estate throughout the United

10   States, including California. Nationally, First American accounts for approximately 29 percent of title

11   premiums, which in 2006 amounted to approximately $4.8 billion.

12       19.    The First American family of title insurance companies and their affiliates are wholly-

13   owned and controlled by defendant First American. Through its subsidiaries, First American is a

14   provider of title insurance, business information, and related products and services. In 2006, First

15   American had revenues of approximately $8.5 billion. The First American family of title insurance

16   companies and their affiliates engaged in the conduct challenged herein with the approval and assent

17   of defendant First American.

18       20.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

19   corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

20   business in California through one or more of its subsidiaries, including but not limited to, defendants

21   Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation and Transnation

22   Title Insurance Company.

23       21.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a Pennsylvania

24   corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. CLTIC

25   does business in California, is a licensed title insurance company in California and is registered to do

26   business in California.

27       22.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation

28   with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does business

1   in California, is a licensed title insurance company in California and is registered to do business in

2   California.

3         23.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska corporation

4   with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. TNTIC does

5   business in California, is a licensed title insurance company in California and is registered to do

6   business in California.

7         24.    The LandAmerica family of title insurance companies – which includes defendants

8   LandAmerica, CLTIC, LTIC and TNTIC, and their affiliates – (collectively, "LandAmerica") is

9   engaged in selling title insurance to purchasers of commercial and residential real estate throughout

10  the United States, including California. Nationally, LandAmerica accounts for approximately 19

11  percent of title premiums, which in 2006 amounted to approximatley $3.15 billion.

12        25.    The LandAmerica family of title insurance companies and their affiliates are wholly-

13  owed and controlled by defendant LandAmerica. Through its subsidiaries, LandAmerica is a provider

14  of title insurance and other products and services that facilitate the purchase, sale, transfer, and

15  financing of residential and commercial real estate. LandAmerica had 2006 revenues of approximately

16  $4 billion. The LandAmerica family of title insurance companies and their affiliates engaged in the

17  conduct challenged herein with the approval of defendant LandAmerica.

18        26.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

19  headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056. STGC does business in

20  California, is a licensed title insurance company in California and is registered to do business in

21  California.

22        27.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation with

23  its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017. STIC does business

24  in California, is a licensed title insurance company in California and is registered to do business in

25  California.

26        28.    The Stewart family of title insurance companies – which includes defendants STGC

27  and STIC, and its affiliates – (collectively, "Stewart") is engaged in selling title insurance to purchasers

28  of commercial and residential real estate throughout the United States and California. Nationally,

1   Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to
2   approximately $2 billion.

3       29.     Together, defendants account for more than 85 percent of the title premiums consumers
4   pay in California. Nationally, they account for more than 85 percent of title premiums, which in 2006
5   amounted to approximately $14.5 billion. Throughout the relevant damages period, defendants
6   charged California consumers in California virtually identical title insurance rates.

7       30.     Certain other persons, firms, corporations and entities, the identities of which plaintiff
8   is not currently aware of, have participated as co-conspirators with defendants in the violations and
9   conspiracies alleged in this Complaint. In order to engage in the offenses charged and violations
10  alleged herein, these co-conspirators have performed acts and made statements in furtherance of the
11  antitrust violations and conspiracies alleged herein.

12                              **FACTUAL ALLEGATIONS**

13      31.     This action arises from a conspiracy to fix, raise, maintain, and/or stabilize prices for
14  title insurance in California. The relevant product market for purposes of this action is the market for
15  title insurance. The relevant geographic market is California.

16      32.     Defendants are the major sellers of title insurance in California, controlling in excess
17  of 85 percent of the market. Title insurers do not compete on the basis of the policies or coverage that
18  they provide. In fact, almost all title policies are based on a single set of form policies published and
19  maintained by the national trade association, the American Land Title Association. Further, the end
20  goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the
21  search uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the
22  real value of the title policy which is written to cover only unknown defects in title at the time of
23  issuance. As a result, title insurance is a commodity product.

24      33.     Title insurance is one of most costly items associated with the closing of a real estate
25  transaction. In California, rates for title insurance are based on a percentage of the total value of the
26  property being insured. For residential properties, this price ranged in 2005 from about $1,010 (for
27  a $250,000.00) property to $1,490 (for a $500,000 property). For more expensive homes and
28  commercial properties, these prices are significantly higher. This amount spent on title insurance has

7

1    risen dramatically over the past decade.

2        34.    Defendants have acted in concert to fix the price of title insurance in California through

3    an illegal scheme of collusive behaviour, market allocation, and kickbacks and other illicit

4    inducements to real estate agents, lenders, and other middlemen who funnel business to defendants,

5    in order to maintain the pricing for title insurance at artificially inflated levels.

6        35.    Defendants, though their memberships in industry rate-setting organizations in other

7    states, including TIRSA in New York, colluded on prices to be charged in California. Defendants have

8    no incentive to compete on pricing to purchasers of title insurance because title companies, in marked

9    contrast to property, casualty, life and other traditional insurance carriers, choose not to market their

10   products directly to the consumers who pay for them. Instead, the title insurance industry operates on

11   what is termed a "reverse competition" model. Reverse competition means that title companies solicit

12   business referrals from the other major players in the home purchase scenario – real estate agents and

13   agencies, banks, lenders, builders, developers and others.

14       36.    Reverse competition, as the term suggests, is not a model that benefits consumers

15   through market-driven forces.  In fact, consumers are bypassed completely as title companies spend

16   nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders, builders,

17   developers and others in an effort to convince these middlemen to steer their home-buying clients to

18   their companies for their title insurance needs.

19       37.    Title insurance companies operate their business on the premise that consumers are

20   generally uninformed or unaware of all matters concerning title insurance.  Consumers are generally

21   not presented, at any time, with an opportunity to make an independent decision regarding any aspect

22   of their property title.  That decision is typically made for them by their lawyer, mortgage broker,

23   lender, or realtor.  Consequently, for most purchasers, the cost of title insurance is not challenged.

24   Most consumers do not even become aware of the price they will pay and to which insurer they will

25   pay it until the actual closing of the real estate transaction.  By then it is too late, consumers cannot

26   attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing

27   the entire transaction.  There is no shopping around.  There is no negotiation of price.

28   //

8

1    38.    This dynamic basically removes the sale of title insurance from the normal competitive

2    process.  Unlike the regular forces of supply and demand that keep most industries and their pricing

3    in check, the title insurance industry is not subject to any real competitive constraints.  The purchasers

4    of the insurance, in most instances, are not the ones making the purchasing decisions.  And, they are

5    certainly in no position to question the price.

6    39.    The most effective, but illegal, way for a particular title insurer to get business is to

7    encourage those making the purchasing decisions – the real-estate middlemen – to steer business to

8    that insurer.  The best way to so motivate the middlemen is not through lower prices (that they are not

9    even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business

10    services and other financial enticements.  Therefore, it is through higher pricing (which allows for

11    generous inducements and kick-backs), not lower pricing, that provides the best way for title insurers

12    to compete and increase their business.

13    40.    In New York, one of several states in which the leading title insurers collectively fix

14    their prices through a rate-setting organization, defendants are members of TIRSA, a voluntary

15    association of title insurers licensed as a rate service organization pursuant to Article 23 of the State

16    of New York Insurance Law.  Until recently, TIRSA's offices were located at the same New York

17    address as defendant Fidelity Title.

18    41.    TIRSA annually compiles from its members statistical data relating to their title

19    insurance premiums, losses and expenses and submits this information in aggregate form to the New

20    York Insurance Department.  TIRSA also prepares and submits the New York Title Insurance Rate

21    Manual which sets forth title rates to be charged and rules to be followed by TIRSA's members.  The

22    Insurance Department has never objected to any of the rates TIRSA has collectively set.

23    42.    TIRSA's membership is comprised of defendant insurers and all other title insurers that

24    are licensed to issue policies in New York.  Currently, Fidelity, First American, LandAmerica, and

25    Stewart collectively represent 14 of TIRSA's 22 members.  As such, they comprise a majority voting

26    block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in

27    particular, TIRSA's collective rate setting activity.

28    //

9

43. There are two principal cost components that go into TIRSA's rate-setting calculation. One comprises the risk associated with issuing the title policy. The other comprises the "agency commissions" paid to title agents.

44. The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer. That is because title insurance protects against unknown *prior* events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy in the United States amounts to only about 5 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

45. The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk, and title insurers typically outsource this task to title agents.

46. The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

47. Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premium is based on the so-called "costs" associated with the payment of agency commissions. Only 15 percent is based on costs associated with the risk of loss.

//

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

48.     TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value – proportional to property value or otherwise – to the consumer. Even search and exam costs are unrelated to property value. They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

49.     There is no provision under the New York Insurance Law for TIRSA to include in its collectively fixed rates kickbacks and other agency commission payments unrelated to the issuance of title insurance. Indeed, the New York Insurance Department has openly acknowledged that it lacks the authority to review any agency commission payments. It has likewise recognized that defendants' outsourcing of agency commission costs has prevented it from performing a meaningful review of TIRSA's calculated rates. This was made clear at a November 2006 public hearing the New York Insurance Department held – the first in 15 years – where it questioned TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup or detail for agency commissions.

50.     At the hearing, the Insurance Department conceded that it could not properly evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost information on agency commissions that TIRSA does not provide.

51.     The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in need of greater state regulation. The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations,* needed to analyze premium prices and underlying costs." (Emphasis added.)

52.     Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supra competitive levels and earn profits that vastly exceed those that would have resulted in a free and open competitive market. Through an independent

11

1   investigation conducted over the past several years, the New York State Attorney General found that
2   for every dollar of insurance premium defendants collected, of the roughly 15 cents that supposedly
3   accounts for the risk of loss, only 3 cents is paid out in claims. And, of the roughly 85 cents that
4   supposedly covers agency commissions, only between 8 and 11 cents goes to costs actually incurred
5   by title agents in producing the title policy. These numbers show that title insurers' collectively fixed
6   rates have resulted in profits that are untethered to and vastly exceed the costs of producing such
7   policies.

8       53.     The New York Attorney General's investigation further revealed that what was largely
9   driving these numbers were the kickbacks and other financial inducements defendants were funneling
10  to and through title agents to secure more business. As reported at the New York Insurance
11  Department's 2006 hearing, one title agency's financial statements revealed that it spent more than $1
12  million of these so-called "agency commissions" on items identified as "Christmas", "automobile
13  expenses", "political contributions", "promotional expenses", and "travel and entertainment". These
14  expenses are not even remotely related to the issuance of title insurance.

15      54.     Defendants have engaged in similar conduct in California, agreeing to set rates at supra
16  competitive prices and to compete based on offering illegal inducements to middlemen. In California,
17  in three successive reports, the Office of the Insurance Commissioner ("OIC") has found an
18  "astonishing number" of such inducements that are in violation of state law. However, the OIC does
19  not actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do
20  so. The absence of regulation has allowed collusive behavior and excessive rates.

21      55.     In fact, in February 2007, the Insurance Commissioner of California, Steve Poizner,
22  issued a statement concluding "that reasonable price competition does not exist for title and escrow
23  services." *Insurance Commissioner Steve Poizner Issues Statement Following Decision by OAL on*
24  *New Regulations*, California Department of Insurance (February 22, 2007).

25      56.     All of this excess money paid to title agents not only works to steer business to
26  defendants. It also serves to boost defendants' own profits through the inflated revenues they obtain
27  to cover these agency payments and through their ownership or management stake in many of these
28  agencies.

12

1   57.   In addition to paying inducements and kick-backs, defendants and their agents divide

2   the market of real-estate middlemen through the use of Affiliated Business Arrangements ("ABAs"),

3   wherein the dominant real estate brokers purchase significant ownership stakes in favored title

4   insurance affiliates. The real estate brokers then reward their associates for using the preferred title

5   insurance providers and lock-out independent title insurers.

6   58.   In addition to the uniformity of rates, other facts suggest that it is more plausible than

7   not that rates have been set based on an agreement to fix prices.

8   59.   In theory, the chain of title should be documented back to its historic grant of ownership

9   centuries in the past. Fear about a possible title defect in the distant past is widely used as a

10  justification by title agencies when convincing property buyers to purchase an owner policy in addition

11  to the lender policy, which is mandatory to secure a mortgage. The title agency, however, saves much

12  time and money when the search is limited to one or two transactions. They rely on the insurance

13  policy to cover the remote chance of missing an earlier but still-valid claim. If such a claim is asserted

14  and survives the scrutiny of the title insurance company's legal department, the expected cost of

15  compensation is likely to be less than the sum of added overhead costs of routinely tracing back every

16  chain of title to the earliest registered owner in the distant past.

17  60.   Title insurance industry officials tend to justify the large proportion of the premium

18  retained by the title abstract and settlement agency (from 60 to more than 90 percent) by the alleged

19  high cost of title searching back into the distant past. In fact, a high proportion of noncommercial

20  properties are searched only through the most recent transaction. No information is available as to

21  what proportion of claims originate in the distant past. The industry has never published pertinent

22  statistics. It would have a marketing incentive to publish these statistics if the risk were significant;

23  that it has not published these statistics indicates that the risk probably is only slightly greater than

24  zero.

25  61.   Many U.S. homes are being resold three or four times in twenty-five years. At each of

26  these occasions, an abstract of title will be prepared on the basis of a more or less thorough review of

27  the available title records, inheritance records, family records and records of past or current liens

28  against a property. It is reasonable, therefore, to suspect that the risk of a title defect will decrease

13

1    every time a property is sold.

2    62.    Title searches have become less labor intensive, especially in large urban counties and
3    cities.  More and more of the information is available online.  The statistical likelihood that a title
4    default would be overlooked is a closely held industry secret, but it appears to be so small that many
5    transactions are now insured on the basis of a search of the last owner's title history or a search into
6    transactions that occurred during the last twenty-five to thirty-five years.  The evidence is strong that
7    the title insurance industry has achieved a remarkably high level of loss minimization.  Indeed, the
8    national everage recovery for a claim on a title insurance policy is appoximately 5% of the total
9    premium.  On the other hand, the national average for property insurance is approximately 80% of the
10   total premium collected.

11   63.    Thus the costs of production have decreased as has the risk of loss yet none of these
12   factors has resulted in price competition at the consumer level.

13   64.    There is a remarkable absence of rate changes by title insurers over the past five years,
14   despite declining costs of production, increased number of transactions and increased revenue per
15   transaction.  During a period when costs per unit of production declined significantly, underwritten
16   title companies and title insurers maintained excessive rates.  The prices charged by title insurers and
17   underwritten title companies were not and are not responsive to the changing costs of production or
18   increasing revenue per transaction at a given set of rates.  Again, this is indicia of an agreement not
19   to compete based on price.

20   65.    As noted, the title companies engage in illegal rebates and kickbacks where the title
21   insurer or the underwritten title company provides money, free services or other things of value to a
22   real estate agent, a lender or homebuilder in exchange for business referrals.  These illegal rebates and
23   kickbacks – a consequence of reverse competition – show that title insurance rates are supra
24   competitive and that some portion of the overcharge is passed from the underwritten title company or
25   title insurer to the referrer of business.

26   66.    A lack of competition and the ability to control prices is enhanced by the fact that there
27   were few title insurer entrants over the period from 1995 through 2005 and the number of title insurer
28   groups declined as title insurers acquired other title insurers.  There were few underwritten title

14

1    company entrants over the 2000 to 2005 period and new entrants were controlled business
2    arrangements whose addition to the market did not result in greater price competition.

3         67.     Access to title plants can be a barrier to entry, but a large barrier to entry exists due to
4    the established relationships between the entities that can steer the consumer's title and escrow
5    business and the entities who sell title insurance and escrow services.

6         68.     The title insurance market is highly concentrated – a few title insurers account for the
7    vast majority of title insurance sales – at both the statewide level and at the county level in California.
8    For example, three title insurer groups account for 77.4% of the market at a statewide level.  At the
9    county level, each individual market was highly concentrated.  The GAO found that First American
10   and Fidelity together had a market share of 66 percent.  Such a concentration enhances the ability of
11   companies to fix prices

12                            **CLASS ACTION ALLEGATIONS**

13         69.     Plaintiff brings this action both on behalf of herself, and as a class action pursuant to
14   Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3), on behalf of the following class (the
15   "Class"):

16          All persons and entities (excluding governmental entities, the Court and
            its staff, defendants, and defendants' predecessors, subsidiaries,
17        affiliates, and business partners) who purchased directly from one or
            more of the defendants title insurance for residential and/or commercial
18        property in California during the four-year period preceding this lawsuit
            (the "Class Period") and who have sustained damages as a result of the
19        conspiracy alleged herein..

20         70.     Although plaintiff does not know the exact number of Class members, since such
21   information is the exclusive control of defendants, plaintiff is informed and believes, and on that basis
22   alleges, that, due to the nature of the trade and commerce involved, Class members are sufficiently
23   numerous, most likely hundreds of thousands of purchasers or more, such that joinder of all Class
24   members is impracticable.  The information as to the identity of the Class members can be readily
25   determined from records maintained by defendants.

26         71.     Plaintiff's claims are typical of the claims of the Class in that plaintiff is a purchaser
27   of title insurance, all Class members were damaged in the same manner by the same wrongful conduct
28   of defendants as alleged herein, and the relief sought is common to the Class.

1    72.    Numerous questions of law and fact that are common to the Class arise from
2    defendants' anti-competitive conduct. Among those common questions of law and fact are:

3        a.    Whether defendants have engaged in illegal price-fixing activity and market
4              allocation and division;

5        b.    The duration and scope of defendants' illegal price-fixing activity and market
6              allocation and division;

7        c.    Whether defendants' illegal price-fixing activity and market allocation and
8              division caused prices of title insurance to be artificially inflated to non-
9              competitive levels; and

10       d.    Whether the Insurance Commissioner has actively supervised defendants'
11             illegal price-fixing activity and market allocation and division.

12   73.    These common questions of law and fact are common to the Class, and predominate
13   over any other questions affecting only individual Class members.

14   74.    Plaintiff will fairly and adequately represent the interests of the Class in that plaintiff
15   is a typical purchaser of title insurance and has no conflicts with any other member of the Class.
16   Moreover, plaintiff has retained competent counsel experienced in antitrust and class action litigation.

17   75.    This class action is superior to the alternatives, if any, for the fair and efficient
18   adjudication of this controversy.

19   76.    Prosecution of separate actions by individual Class members would create the risk of
20   inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants
21   and their co-conspirators.

22   77.    Injunctive relief is appropriate as to the Class as a whole because defendants have acted
23   or refused to act on grounds generally applicable to the Class.

24                                    **FIRST CAUSE OF ACTION**

25                          **Violation of the Sherman Act, 15 U.S.C. § 1**
                                      **(Against All Defendants)**

26   78.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in
27   paragraphs 1-77 above, as though fully set forth in this cause of action.
28

                                              16
CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

79.     The business activities of defendants and their co-conspirators concerning the sale of title insurance were within and had a substantial effect on interstate commerce.

80.     Beginning at least as early as July 2004, the exact date being unknown to plaintiff and exclusively within the knowledge of defendants, defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in the title insurance market in California in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

81.     Defendants and their co-conspirators, by their unlawful conspiracy, artificially raised, inflated and maintained the market prices of title insurance in California, as alleged above.

82.     The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of title insurance they sold in California, and to allocate and divide the market for title insurance in California.

83.     For the purpose of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

(a)     Participating in meetings and conversations to discuss the prices of Passenger Air Transportation services;

(b)     Agreeing to manipulate prices and supply of Passenger Air Transportation in a manner that deprived direct purchasers of free and open competition;

(c)     Issuing price announcements and price quotations in accordance with the agreements reached; and

(d)     Selling Passenger Air Transportation services to customers in the United States at non-competitive prices.

84.     In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a *per se* violation of Section I of the Sherman Act.

1    85.    Defendants' price-fixing, market allocation and division activity has been continuous
2 throughout the relevant damages period and has been renewed and reinforced annually through
3 submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate
4 changes.

5    86.    Through their collective price-fixing, market allocation and division and manipulation
6 of the regulatory process, defendants have harmed competition by charging consumers supra
7 competitive prices for title insurance in California, evidenced in part by the fact that the prices are
8 uniformly higher than compared with the cost of providing the insurance.

9    87.    The aforesaid combination and conspiracy has had the following effects among others:
10 (a) price competition in the sale of title insurance has been suppressed, restrained and eliminated; (b)
11 prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-
12 competitive levels; and (c) purchasers of title insurance have been deprived of the benefit of free and
13 open competition.

14    88.    During the period of the antitrust violations by defendants and their co-conspirators,
15 plaintiff and each member of the Class she represents, has purchased title insurance and, by reason of
16 the antitrust violations herein alleged, paid more than they otherwise would have paid in the absence
17 of these antitrust violations. As a direct and proximate result of defendants and their co-conspirators'
18 wrongful acts, plaintiff and the Class have been injured in their business and property in an amount
19 according to proof at trial, and are entitled to treble damages from defendants and their co-conspirators
20 pursuant to 15 U.S.C. § 15.

21    89.    Plaintiff is informed and believes, and thereon alleges, that, defendants and their co-
22 conspirators, unless restrained, will continue with their conspiracy alleged above.

23    **SECOND CAUSE OF ACTION**

24    **(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*)**
**(Against All Defendants)**

25

26    90.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in
paragraphs 1-89 above, as though fully set forth in this cause of action.

27

28    91.    Beginning at a time presently unknown to plaintiff, but at least as early as July 2004,

18

1 and continuing thereafter at least up to and including the date of the filing of this Complaint,
2 defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in
3 restraint of the trade and commerce described above in violation of Section 16720, California Business
4 and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix,
5 raise, stabilize and maintain prices of, and allocate markets for, title insurance at supra-competitive
6 levels.

7     92.     The aforesaid violations of Section 16720, California Business and Professions Code,
8 consisted, without limitation, of a continuing unlawful trust and concert of action among defendants
9 and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the
10 prices of, and to allocate markets for, title insurance.

11    93.     As a direct and proximate result of defendants' unlawful conduct, plaintiff and the
12 members of the Class have been injured in their business and property in that they paid more for title
13 insurance than they otherwise would have paid in the absence of defendants' unlawful conduct. As a
14 result of defendants' violation of Section 16720 of the California Business and Professions Code,
15 Plaintiff seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to
16 Section 16750(a) of the California Business and Professions Code.

17                                    **THIRD CAUSE OF ACTION**

18                **(Violation of California Business & Professions Code §§ 17200 *et seq.*)**
                                   **(Against All Defendants)**
19
20    94.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in
paragraphs 1-93 above, as though fully set forth in this cause of action.
21
22    95.     The acts, omissions, misrepresentations, practices and non-disclosures of defendants
and their co-conspirators, as alleged herein, constituted a common continuous and continuing course
23
of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or
24
practices within the meaning of California Business and Professions Code, Section 17200 *et seq.*,
25
including, but not limited to, the following:
26
              a.     The violations of Section 1 of the Sherman Act set forth above;
27
              b.     The violations of the Cartwright Act set forth above;
28

---
                                              19

1
2
3
4
5

    c.    The acts, omissions, misrepresentations, practices and non-disclosures of defendants and their co-conspirators described above, whether or not in violation of the Sherman Act or the Cartwright Act, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

6
7
8

    d.    The acts and practices alleged above of defendants and their coconspirators are unfair to purchasers of title insurance in the State of California, within the meaning of Section 17200, California Business and Professions Code; and

9
10
11

    e.    The acts and practices of defendants and their co-conspirators alleged above are fraudulent and deceptive within the meaning of Section 17200 of the California Business and Professions Code.

12    96.    Plaintiff, and each member of the Class, has suffered injury in fact and has lost money

13 or property as a result of defendants and their coconspirators' unfair, unlawful and/or deceptive

14 practices by paying a higher price for title insurance then she would or should have absent the conduct

15 complained of.

16    97.    Plaintiff, and each member of the Class, is entitled to full restitution and/or

17 disgorgement of all revenues, earnings, profits, compensation and benefits which may have been

18 obtained by defendants and their coconspirators as a result of their unfair, unlawful and/or fraudulent

19 business acts or practices.

20    98.    The illegal conduct alleged herein is continuing and there is no indication that

21 defendants and their coconspirators will not continue such activity into the future.

22    99.    As alleged in this Complaint, defendants and their co-conspirators have been unjustly

23 enriched as a result of their wrongful conduct. Plaintiff and the members of the Class are accordingly

24 entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits,

25 compensation and benefits which may have been obtained by defendants and their coconspirators as

26 a result of such business practices, pursuant to the California Business and Professions Code, Sections

27 17203 and 17204.

28 //

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment and Disgorgement of Profits)
### (Against All Defendants)

100.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-99 above, as though fully set forth in this cause of action.

101.    Defendants have been unjustly enriched through overpayments by plaintiff and the other Class members and the resulting profits.

102.    Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred via overpayments by plaintiff and the other Class members.

103.    Plaintiff seeks disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which plaintiff and Class members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendants, their co-conspirators, and each of them, as follows:

1.    That the Court determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2.    For a declaration that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.    For a preliminary and permanent injunction enjoining defendants, their co-conspirators, and all persons acting for, with, by, through, or under them, and each of them from further commission of the unlawful combination and conspiracy alleged herein;

4.    For damages to plaintiff and the Class, and treble those damages;

5.    For all costs and expenses of suit of plaintiff and the Class, including reasonable attorney's fees; and

//
//
//

1      6.    For such other and further relief as the Court may deem just and proper.

2    Dated: July 25, 2008

3                                    GROSS BELSKY ALONSO LLP

4

5                                    By:
                                          Adam C. Belsky

6
                                     Attorneys for Plaintiff SUSAN DOOLITTLE
7                                    and the Proposed Class

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **JURY TRIAL DEMAND**

2        Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury as to all

3  issues triable by a jury.

4  Dated:  July 25, 2008

5                                      GROSS BELSKY ALONSO LLP

6

7                                      By:_____
                                            Adam C. Belsky
8
                                        Attorneys for Plaintiff SUSAN DOOLITTLE
9                                       and the Proposed Class

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28